PAN AMERICAN WORLD AIRWAYS INC., a New York corporation, Plaintiff, v. UNITED AIRCRAFT CORPORATION, a Delaware corporation, Defendant.

(*July* 18, 1963.)

TERRY, Chief Justice (sitting by Assignment).

*James M. Tunnell, Jr.,* and *Andrew B. Kirkpatrick, Jr.* (of the firm of Morris, Nichols, Arsht and Tunnell) and *Frederick L. Atwood* (of the firm of Haight, Gardner, Poor and Havens (of New York City) for the plaintiff.

*William Prickett, Sr.*, and *William Prickett, Jr.* (of the firm of Prickett, Prickett and Tybout) for the defendant.

Superior Court for New Castle County, No. 1084, Civil Action, 1956.

TERRY, Chief Justice (by assignment).

This is an action in tort instituted by Pan American World Airways, Inc., hereinafter called Pan American, against United Aircraft Corporation, a Delaware corporation, hereinafter called United. The issues presented for determination relate to the alleged negligence of United, together with one of its corporate divisions in the supply and use of a 5U18 governor for DC-7B aircraft, owned and operated by Pan American.

The DC-7B aircraft, manufactured by Douglas Aircraft Co., Inc., flies by the use of four turbo compound engines. These engines contain as a component part propellors manufactured by the Hamilton Standard Division of United. The governors used in connection with these propellors are supplied by Hamilton Standard. An important component part of these governors is a drive gear shaft manufactured by Woodward Governor Co. for Hamilton Standard. This governor and its parts were developed and manufactured in the early 1940s, and were thereafter supplied by Hamilton Standard for use on various aircraft types such as DC-6, DC-7, Constellations, and others.

The 5U18 governor was recommended by Hamilton Standard for use on the DC-7B aircraft, and, in fact, supplied to Douglas for use as original equipment on that airplane.

During the trial of this case several of the country's outstanding aeronautical engineers appeared as witnesses and testified in reference to the functions which these

governors performed. One witness described them as the "heart and brains" of the engines used on large propellor driven aircraft. The engines of these propellor driven aircraft are designed to operate within a pre-determined constant speed range for each of several flight and power conditions. The governor maintains this constant speed by controlling the angles at which the propellor blades strike the air while rotating. They, therefore, regulate the load imposed upon the engine by the drag of the propellor. Whenever an aircraft encounters conditions which have a tendency to resist a pre-determined setting of the engines the governor automatically rotates the blades to a pitch which permits the speed designated by its original power setting; thus, the aircraft engines are able to maintain constant speed in accordance with their pre-determined settings.

In addition to varying the blade pitch to maintain constant speed, the governor also performs an important function in feathering and reversing the engines. When an engine is feathered the flat surfaces of the propellor blades are rotated so that they can be made to parallel the air stream and thus create minimum drag in the event of engine failure or other malfunction. When the engines are reversed the propellor blades are so positioned that their movement through the air creates a reverse thrust for use as a brake during landing.

The 5U18 governor is installed on the nose cone section of the engine. It obtains engine oil, boosts its pressure, and transmits its selectivity through various passages to one side or the other of a piston in the dome located forward of the propellor. In operation the governor directs oil to this piston and thereby controls the pitch of the propellor blades.

The component drive gear shaft previously referred to is a hollow steel cylinder. A gear extends from its body. Between its bottom and that gear are two sets of ports, through which oil regulating the propellor blade angle is transmitted. The uppermost set of these control ports delivers oil to move the blades to high pitch, and the lower set to low pitch.

The basis of this action concerns two fractures of this drive gear shaft operating within the 5U18 governor on certain DC-7B aircraft owned by Pan American.

Pan American flight No. 65—(DC-7B), carrying 47 passengers and a crew of six, departed Shannon, Ireland on December 26, 1955, bound for New York. Approximately 6½ hours after take-off, and while the aircraft was in route over the Atlantic approximately 750 miles from Goose Bay, Labrador, the propellor on engine No. 3 began an uncontrollable overspeed. At the time of the overspeed, the aircraft was cruising at an altitude of approximately 16,000 feet. The Captain was unsuccessful in attempting to control the overspeed by feathering the propellor. The Captain then attempted to freeze the propellor by stopping the flow of oil to the engine. He was successful in stopping the engine, however, the propellor disengaged itself from its mechanical connection with the power section of the engine and continued to "windmill" for the duration of the flight. The Captain, realizing the danger, proceeded with difficulty and adverse weather conditions to Goose Bay where he made an emergency landing.

The parties have stipulated that the damages incurred to this aircraft resulting from this incident amounted to a total of $72,000, exclusive of interest thereon from December 26, 1955.

The actual cause of this particular malfunction was not immediately known. However, Pan American removed

the governor at Goose Bay and had it flown to Idlewild International Airport. Upon its arrival on December 27th, it was immediately delivered to Hamilton Standard at its Connecticut plant. While this inspection by Hamilton Standard was in progress a second similar incident occurred.

On December 28, 1955, a Pan American flight operated with the DC-7B aircraft containing the 5U18 governor departed from Rome, Italy for Brussels, Belgium, on a segment of a flight ultimately bound for New York. The flight carried a crew of six, together with 42 passengers. Approximately one hour after take-off, and while the aircraft was cruising at an altitude of 19,000 feet, there developed an overspeed in No. 3 engine. Efforts to feather the propellor and to control the overspeed were unsuccessful. A fire developed, which could not be extinguished by any means available to the flight crew.

The Captain reduced air speed and started a descent in an effort to control the over-speeding engine and propellor. The intensity of the fire increased, and it appeared that the fire would proceed into the wing. After descending to an altitude of approximately 5000 feet the Captain surveyed the terrain in preparation for ditching. At this time the aircraft was in the vicinity of a beach on the Adriatic coast of Italy. At this point the aircraft began to vibrate violently. Flashes of brilliant light emanated from the No. 3 engine, after which it and its propellor miraculously fell clear of the aircraft. With the loss of the propellor and engine from the wing, no further danger of fire existed. The plan for ditching was abandoned. The Captain flew the aircraft back to Rome, where it was successfully landed.

The parties have stipulated that as a result of this incident the damages to the aircraft amounted to $169,000,

exclusive of interest and an amount claimed by Pan American for the loss of use of the aircraft during the period of repairs.

Pan American, after receiving word relating to the Rome flight on December 28th, and after having obtained news from Hamilton Standard that the governor on the plane making the forced landing in Goose Bay contained a fractured shaft in its governor, grounded its DC-7B Fleet and called back all DC-7B planes in flight which were not beyond the point of no return and grounded that fleet of aircraft until preventive measures could be taken.

In addition to these two incidents involving DC-7B aircraft owned by Pan American, two other incidents occurred in October, 1955, but do not form the basis of this action.

The issues at trial related to the negligence, if any, of United in the use of the particular type of drive shaft contained in the 5U18 governor and used on the DC-7B aircraft.

Expert testimony adduced at trial is pertinent to a proper determination of the issues involved.

The 5U18 governors aboard the two ill-fated Pan American flights and others delivered for use on the DC-7B aircraft contained a certain drive gear shaft denoted by the manufacturer as Model 67035. In these shafts the high and low pitch sets of oil ports are located between the bottom of the shaft and the gear along the shaft. Each set of ports is separated by posts, which are located in grooves and are beveled on their sides so that their outside surface is smaller than their inside. The ports themselves are rectangular in shape, with square corners where their top and bottom sides join the posts.

It is quite clear to me from the testimony adduced at trial that these shaft fractures originated at certain quench cracks located in the carriers of the high pitch oil ports and propagated by metal fatigue due to torsional stress. A quench crack occurs when steel is cooled in oil at room temperature after having been heated to a high temperature in order to harden it. The surface of the piece cools more rapidly, and, since metal contracts when cold, the rate of change between the exterior and interior differs so that one pulls against the other. These opposing dimensional changes within the metal create stresses which can cause a quench crack. The metal fatigue referred to is the progressive cracking of metal by the application of a series of loads or forces less than the force required to break in one application. Expert testimony indicated that fatigue may be accomplished by the application of a few heavy loads or by the application of a greater number of light loads. Torsional stress is imposed by a twisting load.

United contends that the 5U18 governor containing the 67035 shafts had been in use for many years without a single mishap. However, according to the expert testimony of Pan American these shafts only fractured on the DC-7B aircraft either because other aircraft on which they had functioned had not imposed the torsional loads on the shaft similar to those of the DC-7B, or other shafts of that type used on other aircraft had not contained comparable quench cracks in their port corners, or because of a combination of both.

The two fractures involved in this action were preceded by two earlier fractures on other DC-7B aircraft in October, 1955. Hamilton Standard advised Pan American on November 11, 1955, that these two earlier fractures occurred in shafts which had come from the same manufacturer's batch. Thus Hamilton concluded that the problem related to shafts from this particular batch. Hamil-

ton had previously advised Pan American by telegram on November 10th, that both of these incidents resulted from fractures of the governor drive shafts originating at quench cracks and propagated by fatigue. Hamilton advised Pan American that the solution was to remove all drive shafts originating from this particular "suspect" batch. Quench cracks are defects which formed the basis of rejection of the part. Relying upon this advice Pan American considered the only problem to be quench cracks which had escaped detection in this particular "suspect" batch. Pan American contends that until the subsequent fractures in December, that it accepted the theory of Hamilton Standard that the cause of the fracture was due entirely to the faulty batch of drive gear shafts.

Expert testimony produced at trial indicated a different theory in that the fault actually lay in a combination of things; that is, the existence of quench cracks, metal fatigue and torsional stress. It is clearly evident to me that the design of the square ports was by no means suitable for the environmental operations of the DC-7B. These fractures occurred at cruise speed. The environment to which these drive shafts are subjected when a DC-7B is at cruise speed is entirely different from any other environment to which they had been previously subjected in other types of aircraft. The testimony clearly shows without contradiction that once the corrective measures were taken to strengthen the shafts by rounding the corners of the ports the problem of fractures was eliminated.

A highly qualified metallurgist from the Massachusetts Institute of Technology testified that such fractures were inevitable when the gear shaft with square ports was subjected to the DC-7B environment. By rounding the corners of the ports greater support has been given to the

shafts. The possibility of metal fatigue through the elongation of quench cracks caused by torsional stresses is therefore avoided.

United produced at trial a report by one of its witnesses, Mr. Parry, which attempted to exonerate it from negligence. As Pan American contends this report was compiled over several years concerning a shaft which, after these incidents, was completely discarded for use in the DC-7B. The discontinuance of its use and the redesign of the ports, coupled with a complete absence of any subsequent difficulty in the present shafts, indicates clearly to me that the fault lay in the old design and a failure of United to properly evaluate the environmental stresses to which the shafts would be subjected in the DC-7B aircraft.

Hamilton Standard had knowledge of a vibratory environment at cruise conditions in the DC-7B which was unlike any to which the shaft had previously been subjected. Thus, a simple test could have been made by United to determine by pressure pulsation what loads the shafts could endure. It is apparent that the pulsations against which this particular shaft was operating on the DC-7B were approximately twice as great as those which United's Chief Engineer believed the shaft had been designed to sustain.

United contends that Pan American became suspicious of these shafts prior to the two fractures in December, 1955. It contends that Pan American was guilty of contributory negligence when it operated its aircraft once the suspicions of its engineers were aroused. In answer to queries by United's counsel on cross-examination, certain Pan American witnesses testified that economics prevented them from grounding their DC-7B Fleet in order to ascertain the real source of the problem. Such is at best a callous appraisal of the obligation of an aircraft

carrier in the performance of its duties to the public. It is shocking indeed to learn that the security of passengers should ever give way to the cold aspects of monetary benement of those persons who were involved in the manufacture and supply of this gear shaft. *Uesch v. Abrasive Co. of Phila.*, 353 Mo. 558, 183 S.W.2d 140, 156 A.L.R. 469; Sec. 83 Prosser, Law of Torts, 2d Ed., 347. See also *Noel et al v. United Aircraft Corporation* (U.S. District Court, Del., July, 1963)—F.Supp.—. We must delineate between Pan American's attitude toward the public in this respect and its attitude as a matter of law on the question of caring for its own equipment.

In view of the evidence before me, I conclude that Hamilton Standard was negligent in that it failed to supply a gear shaft which would operate under environmental conditions which United knew were different to those to which it had been previously subjected, and that such negligence on defendant's part was a proximate cause of Pan American's damages. As a factual matter I do not befits. The existence of such an attitude, however, is not in itself contributory negligence per se. My conclusion in that respect is governed by one important fact. Hamilton Standard had assured Pan American after the first two fractures, and prior to those which form the basis of this suit, that the trouble emanated from a single faulty batch of gear shafts. Insofar as the issue of contributory negligence is concerned, I am of the opinion that Pan American had the legal right to rely on the evaluation of the people who supplied the gear shaft. Perhaps as a matter of caution, and certainly out of its obligation for the safety and welfare of its passengers, Pan American should have gone farther, but under the facts as they exist I do not consider that Pan American's failure to do so constituted contributory negligence. I believe that Pan American as a bare principle of law had the right to rely on the judg-

lieve that the evidence substantiates the charge of United that Pan American was guilty of contributory negligence.

██ I now turn to the question of damages. Physical damages to the aircraft have been set forth above and were stipulated to by the parties. I consider that to be the extent of damages to which Pan American is entitled to recover.

In addition to these damages, Pan American has attempted to show a loss of profits from these aircraft while they were out of service for repairs. The evidence adduced by United clearly shows that there was no interruption in the normal services of Pan American as a result of these incidents, and Pan American could prove no loss of passenger revenue. Pan American argued, however, that it could have possibly leased these planes, but it likewise failed to show that there was any demand for their use. I, thus, conclude that as a factual matter Pan American has not shown by a preponderance of the evidence that it sustained any such damages. I feel constrained, however, to dispose of one argument advanced by plaintiff's counsel in this regard. It was argued that the loss of use of these planes was similar to the loss of use of property which has been wrongfully detained by another. I do not believe that it requires any citation of law to clearly indicate that as a factual matter there is no analogy between a wrongful detention of an item and the loss of use thereof occasioned by the negligence of another. In the former case there is an element of willfulness and force. It is in repayment for the loss occasioned by such misconduct that damages are permitted in the former instance. In the latter case, however, no such elements are present. There was no intentional deprivation by United of Pan American's use of these aircraft, and I cannot accept Pan American's thesis that it is entitled to unproven damages for such an alleged loss.

Judgment is therefore rendered in favor of Pan American for the sum of $241,000, comprising $72,000 for the incident which occurred on December 26, 1955, and $169,000 for the incident which occurred on December 28, 1955 —legal interest to run on the sum of $72,000 from the date of December 26, 1955, and from December 28, 1955, on the sum of $169,000.

An order will be entered upon motion.